UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

            – v. –                                   :                16 Cr. 377 (PAE)

JOHN AFRIYIE,                                     :

                Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


JOON H. KIM
Acting United States Attorney
Southern District of New York
Attorney for the United States of America

Edward A. Imperatore
Christine I. Magdo
Assistant United States Attorneys
      - Of Counsel -

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

**I.**     **Offense Conduct** ............................................................................................. 1

    A.   Afriyie's Employment at MSD Capital ....................................................... 2

    B.   Afriyie's Insider Trading in XPO Logistics Securities ................................ 3

    C.   Afriyie's Insider Trading in ADT Securities ............................................... 4

**II.**    **Afriyie's Refusal to Appear for Trial** ........................................................... 7

**III.**   **The Jury Verdict** ............................................................................................ 8

**IV.**    **The Guidelines Calculation** .......................................................................... 9

    A.   The Loss Amount Was Correctly Calculated ............................................ 10

    B.   An Enhancement for Obstruction of Justice Is Warranted ........................ 13

    C.   An Enhancement for Abuse of a Position of Special Trust is Warranted .... 17

**V.**     **The Section 3553(a) Analysis** ...................................................................... 21

    A.   The Nature and Circumstances of the Offense and the Need to Provide Just
        Punishment ................................................................................................ 21

    B.   Afriyie's History and Characteristics ........................................................ 22

    C.   The Need for Deterrence and to Promote Respect for the Law .................. 23

**VI.**    **The Government's Proposed Restitution Order** .......................................... 25

**CONCLUSION** ............................................................................................................... 27

# Table of Authorities

**Cases**

*Shafer* v. *United States*, 134 S. Ct. 2320 (2014) ........................................................... 16

*United States* v. *Amato*, 540, F.3d 153 (2d Cir. 2008) .................................................. 26

*United States* v. *Braverman*, No. 14 Cr. 748 (PAE) (S.D.N.Y. Aug. 19, 2015) .............. 18, 19

*United States* v. *Brennan*, 395 F.3d 59 (2d Cir. 2005) .................................................. 11

*United States* v. *Concepcion*, 983 F.2d 369 (2d Cir.1992) ........................................... 11

*United States* v. *Gadsden*, 616 F. App'x 539 (4th Cir. 2015) ....................................... 16

*United States* v. *Heffernan*, 43 F.3d 1144 (7th Cir. 1994) ........................................... 24

*United States* v. *Horne*, 474 F.3d 1004 (7th Cir. 2007) ............................................... 11

*United States* v. *Kurniawan*, 627 F. App'x 24 (2d Cir. 2015) ...................................... 10

*United States* v. *Lee*, 818 F.2d 1052 (2d Cir.) ............................................................ 12

*United States* v. *Malki*, 609 F.2d 503 (2d Cir. 2010) .................................................. 17

*United States* v. *Margiotta*, 646 F.2d 729 (2d Cir. 1981) ........................................... 10

*United States* v. *Morris*, 573 F. App'x 712 (10th Cir. 2014) ....................................... 16

*United States* v. *Olmeda*, 461 F.3d 271 (2d Cir. 2006) ......................................... 10, 11

*United States* v. *Revel*, 971 F.2d 656 (11th Cir. 1992) ............................................... 16

*United States* v. *Roland*, 748 F.2d 1321 (2d Cir.1984) ............................................... 12

*United States* v. *Rutkoske*, 506 F.3d 170 (2d Cir. 2007) .............................................. 9

*United States* v. *Simpson*, 741 F.3d 539 (5th Cir. 2014) ............................................ 16

*United States* v. *Sturdivant*, 244 F.3d 71 (2d Cir. 2001) ............................................ 10

*United States* v. *Sweig*, 454 F.2d 181 (2d Cir. 1972) ................................................. 12

*United States* v. *Tutino*, 883 F.2d 1125 (2d Cir. 1989) .............................................. 10

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013) .................................................... 10

**Statutes**

18 U.S.C. § 1512(c)(1) ............................................................................................... 17

## PRELIMINARY STATEMENT

The Government submits this memorandum in connection with the sentencing of defendant John Afriyie ("Afriyie" or the "defendant") and in response to Afriyie's sentencing submissions filed on May 5, 2017 ("Def. Let."), July 12, 2017 ("Def. Mem.") and July 17, 2017. Afriyie was convicted after trial of one count of securities fraud and one count of wire fraud in connection with his trading on material nonpublic information ("MNPI" or "Inside Information") obtained from his employer. For the reasons discussed below, a sentence of imprisonment within the applicable Guidelines range of 78 to 97 months would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.[1]

## I.     Offense Conduct

On January 30, 2017, John Afriyie was convicted by a jury on both counts contained in Indictment 16 Cr. 377 (PAE) (the "Indictment"). The evidence at trial established that Afriyie, an investment analyst at the Wall Street investment firm MSD Capital ("MSD"), obtained Inside Information from MSD about the upcoming acquisition of ADT Corp. ("ADT"), a public company. From January 28, 2016 through February 17, 2016, Afriyie used that information to execute highly profitable trades in ADT call options through a brokerage account he held in his mother's name. As a result of this illegal trading, Afriyie turned a $25,000 investment into $1.53 million in criminal profits. The evidence introduced at trial as to this scheme and the two counts in the Indictment was overwhelming, and is summarized in part below.

---

[1] Throughout this memorandum, "GX" refers to Government exhibits that were introduced at trial; "Tr." refers to the trial transcript; "PSR" refers to the Final Pre-Sentence Investigation Report dated May 18, 2017; and "D.E." refers to docket entries in this case.

### A.  Afriyie's Employment at MSD Capital

In January 2015, Afriyie was hired as an analyst by MSD Capital, an investment firm created by Michael Dell, the founder of Dell Computers. As an analyst at MSD, Afriyie's job was to research potential investments for MSD, and to make recommendations about those investments. On the first day of Afriyie's employment with MSD, he signed a confidentiality agreement stating: "I understand that my employment with MSD creates a relationship of confidence and trust between MSD and me." (GX-140). MSD employees were forbidden from trading in securities based on information they obtained through their employment at MSD. The MSD Employee Handbook stated that employees were "strictly prohibited from engaging in securities transactions on the basis of information not available to the general public, which, if known to outsiders, might affect their investment decisions." (GX-114, at 134).

In fact, MSD employees were barred from trading in any individual securities, whether in the form of stocks or options. According to the MSD Code of Ethics, an employee "may not generally transact in the debt or equity securities of any public issuers during [his] employment," including options. (GX 111, at 37). Afriyie received extensive training on MSD's policies against insider trading and regarding the safekeeping of confidential client information; Afriyie himself certified that he understood and agreed to abide by MSD's policies. On six separate occasions, Afriyie certified to MSD that he was not doing any personal trading. (GX 115, 117, 118, 119, 120).

However, Afriyie's certifications to MSD were knowingly and intentionally false. As described in more detail below, throughout the course of his employment with MSD, Afriyie traded in single-name securities in a TD Ameritrade brokerage account that Afriyie registered

with the name, date of birth and social security number of Afriyie's mother, Lawrencia Afriyie (the "Brokerage Account"), but which Afriyie controlled at all times and hid from MSD. Afriyie ultimately used that account to commit insider trading.

### B. Afriyie's Insider Trading in XPO Logistics Securities

In April 2015, approximately three months after he joined MSD, Afriyie was assigned by MSD to evaluate an investment opportunity related to transactions involving XPO Logistics ("XPO"), a public company. (PSR ¶ 16). MSD received MNPI regarding XPO's plans to raise more than $1 billion in a private placement and to issue about $2 billion in notes, transactions that would dilute the ownership interest of existing XPO shareholders and potentially have a negative effect on XPO's stock price. (PSR ¶ 20). Afriyie, through his work for MSD, received MNPI concerning the deal, including the total amount of securities being offered and information about XPO's balance sheet. (*Id.*) In order to help MSD determine whether to invest in XPO, Afriyie used MNPI to build a financial model, which was saved to the firm's "R" (for "research") drive. (PSR ¶ 21).

During the time that he was in possession of MNPI regarding XPO, Afriyie repeatedly bought XPO put options, among other XPO securities, in the Brokerage Account. (PSR ¶ 22). Buying put options is consistent with a belief that the price of the underlying stock will go down in the future.   While Afriyie correctly understood that the MNPI relating to the XPO transactions would cause XPO's stock price to drop, XPO's stock price ultimately did not dip below the strike price Afriyie had set for the put options. Thus, Afriyie's illegal trading in XPO options did not ultimately result in a profit for Afriyie. (PSR¶ 23).

### C.  Afriyie's Insider Trading in ADT Securities

In January 2016, Apollo Global Management ("Apollo") decided to acquire ADT, a publicly-traded company in the home security and alarm industry. In order to finance the anticipated acquisition, Apollo reached out to a number of investment firms, including MSD, to raise capital. MSD expressed an interest in investing, and Apollo agreed to provide MNPI about the ADT deal to MSD, in order to allow MSD to make an informed investment decision. On January 27, 2016, MSD's Compliance Department sent a "potential restriction" email to its investment professionals, including Afriyie, indicating that MSD was on the verge of receiving MNPI regarding "a "US-Listed Alarm Monitoring Services Company ($1-5b market cap)" due to a "[f]inancing opportunity in connection with a potential take-private transaction by an Apollo Global portfolio company" that was "expected to close in [the first half of] 2016." (GX 107). Donald Bilson, a third-party analyst who followed the security and alarm industry, testified at trial that ADT was the only company that met the description in the potential restriction email, and that he considered ADT to be "in a universe of one." (Tr. 785).

The morning after his receipt of the potential restriction email from the MSD Compliance Department, Afriyie began snooping through the ADT and Apollo folders on MSD's R drive, which was accessible only to MSD research professionals like Afriyie. (Tr. 409, 427, 439). Just minutes later, Afriyie purchased his first ADT call option. Buying a call option is consistent with a belief that the value of the underlying equity will rise in the future – as Afriyie knew ADT's stock would when it was announced that ADT was being acquired.

That afternoon, ADT was added to MSD's list of restricted securities, and Afriyie received an email notifying him of this addition. (GX 108). The two restriction emails that Afriyie received

4

from MSD – on January 27 and 28, 2016 – taken together, spelled out that Apollo was planning to acquire ADT, and that the acquisition was going to happen soon. When Afriyie arrived at MSD on the morning of January 29, 2016, he immediately purchased 25 ADT call options with a strike price of $32. (GX 406, 407). Because there were almost no funds in the Brokerage Account, Afriyie wired $2,000 from his personal bank account at Bank of America (the "Savings Account") to the Brokerage Account. (GX 409). Afriyie placed nearly all his ADT trades from inside MSD's offices. (GX 15). Afriyie continued to purchase additional short-term, $32 ADT call options on January 29, February 1 and February 2, 2016. (GX 406). These options were far out-of-the-money—ADT was trading at less than $25 per share, and its share price had been trending downward for more than a year (GX 14)—and therefore very risky for the average investor, *i.e.*, someone not in possession of MNPI.   But for a person with MNPI, they represented a cheap way to realize massive short-term profits.

        In early February 2016, as he continued to purchase ADT call options, Afriyie accessed nearly 100 sensitive documents relating to the ADT acquisition—many of them repeatedly—from the ADT virtual data room that was maintained on the R drive at MSD. (GX 17). Having worked on similar deals in the past, Afriyie knew exactly where to look for the most pertinent documents. Many of these documents contained MNPI, and Afriyie had no legitimate reason or need to access them. From his years of experience in the field, Afriyie had the ability to use such MNPI to estimate the stock price premium (*i.e.,* how much over the current price Apollo would offer ADT shareholders), and to predict the timing and likelihood of such an acquisition being announced. The repeated pattern of Afriyie's accessing MNPI about the ADT acquisition and then placing ADT trades just hours or minutes later was devastating evidence of his insider trading.

5

Afriyie wired his own money from the Savings Account to the Brokerage Account in order to buy the ADT call options. The cell phone number and email address linked to the Brokerage Account belonged to Afriyie. Afriyie used the TD Ameritrade application on his iPhone to trade securities—including ADT call options in January and February 2016—through the Brokerage Account. At trial, the Government also introduced a number of recorded calls that Afriyie had placed to TD Ameritrade's customer service department. Afriyie pretended to be his mother on the calls, falsely introducing himself as "Lawrencia Afriyie" or "Larry Afriyie."

The information Afriyie stole from his employer was clearly material.   ADT's stock price shot up by a whopping 47.5 percent on the day of the announcement of the acquisition. As a result of the sudden increase in ADT's stock price, the value of Afriyie's investment in ADT call options increased by 6000 percent in one day. Afriyie converted $25,000 in ADT call options into one and a half million dollars.

After the public announcement that ADT would be acquired, Afriyie placed additional calls to TD Ameritrade's recorded customer service line. For example, on February 18, 2016, Afriyie called to confirm how much "margin" he could obtain based upon his $1.5 million in cash, a reference to Afriyie's profits from the ADT call options. (PSR ¶ 29). The following day, Afriyie called to inquire how he could maximize his profit on the 924 ADT call options contracts that had yet to be sold. (PSR ¶ 30).

In late February and early March 2016, Afriyie wired a total of $150,000, representing a portion of the proceeds from the ADT call options trading, from the Brokerage Account into the Savings Account. (PSR ¶ 31). Afriyie used the money he transferred on a variety of personal expenses, including student loan payments, clothing, trips to Las Vegas and Miami, and bottle

6

service at a New York City nightclub. (*Id.*) Afriyie used the remaining proceeds of the illegal

trading to continue to trade other securities in the Brokerage Account. (*Id.*) That trading proved to

be lucrative, and the value of the Brokerage Account had increased to approximately $2.63

million by mid-April 2016.

On April 13, 2016, Afriyie was approached by law enforcement agents outside his

apartment building in Manhattan. (PSR ¶ 36). Afriyie lied to the agents. He denied both that it

was his voice on the TD Ameritrade recordings and that he had traded in ADT call options.

Afriyie was arrested that day, and released on bail. (PSR ¶37). On April 15, 2016, two days after

his arrest, Afriyie falsely changed the name on a Gmail email account associated with the

Brokerage Account (the "Email Account") from his own name to the name "Larry Afriyie," in an

effort to distance himself from his Email Account. (PSR ¶ 32). He then deleted the entire Email

Account, which contained emails reflecting that Afriyie, rather than his mother, controlled the

Email Account. (*Id.*) And even after law enforcement agents had played him a portion of the

recorded TD Ameritrade calls, Afriyie continued to call TD Ameritrade, pretending to be his

mother. (PSR ¶¶ 33-34). For example, in June 2016, Afriyie called TD Ameritrade asking how the

brokerage firm tracked the IP location of trades that were placed from mobile devices. (*Id.*) In

another call, Afriyie attempted to effect a high-pitched voice in an effort to sound like a woman.

**II.     Afriyie's Refusal to Appear for Trial**

Trial in this case was scheduled to begin on January 23, 2017. That morning, Afriyie

refused to appear in court. (PSR ¶ 38). After more than an hour spent waiting for Afriyie to

arrive, the Court instructed defense counsel to contact Afriyie. (*Id.*) After speaking with Afriyie,

defense counsel represented to the Court that Afriyie "is in New Jersey . . . He has not agreed to

join us today." (*Id.*). The Court then issued a bench warrant and Afriyie was arrested at a hotel in New Jersey. Despite the Court's order that Afriyie bring court-appropriate attire with him, Afriyie refused to do so. (PSR ¶ 39). Upon his arrival in court that evening, the Court held an *ex parte* conference with Afriyie and his counsel during which Afriyie made what the Court characterized as "willfully untrue statements" to the Court about why he had failed to appear that morning for trial. (PSR ¶ 40). Afriyie was remanded and remains in custody. (PSR ¶¶ 6, 39).

### III.    The Jury Verdict

The jury returned a verdict of guilty on both counts of the Indictment. Thereafter, the jury was asked to render a special verdict concerning the forfeitability of certain specific property, namely, $15,969.07 formerly on deposit in the Savings Account, and $2,632,893.39, representing the liquidated value of the assets formerly held in the Brokerage Account (together, the "Specific Property"). These amounts were forfeitable because Afriyie used the approximately $1.53 million in profits from the exercise and sale of the ADT call options to make additional investments, which increased the value of the funds traceable to illegal trading to approximately $2.65 million. On January 31, 2017, the jury returned a special verdict, concluding that all of the Specific Property constituted or was derived from Afriyie's crimes.[2]

---

[2] On July 19, 2017, in response to Afriyie's request that the Court reconsider the forfeiture orders it has entered in this case (D.E. #87, 127, 130), the Court issued an order (D.E. #139) directing each party to file a letter recapping its position on the facts and law with respect to forfeiture by July 21, 2017. The Government will file such a letter setting forth its forfeiture position.

**IV.      The Guidelines Calculation**

As correctly determined by the Probation Department in the Presentence Report, the Guidelines range for Afriyie's criminal offenses is calculated as follows:

1.      Pursuant to U.S.S.G. §§ 3D1.2(b) and (d), because Counts One and Two are connected by a common criminal objective and the offense level for the counts is determined largely on the basis of the total amount of gain, both counts of conviction are grouped together into a single group.

2.      Pursuant to U.S.S.G. § 2B1.4(a), which is the applicable Guideline for insider trading, the base offense level is 8.

3.      Pursuant to U.S.S.G. §§ 2B1.1(b)(1)(l) and 2B1.4(b)(1), as demonstrated at trial and as set forth in the Presentence Report, the gain from Afriyie's offenses is more than $1,500,000 but no more than $3,500,000 and thus Afriyie's offense level is increased by 16 levels. The base offense level for insider trading is increased by the "gain resulting from the offense" from the table in § 2B1.1(b)(1). The "gain" is "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information . . . ."   U.S.S.G. § 2B1.4. cmt. This Court need only make "a reasonable estimate" of the gain. U.S.S.G. § 2B1.1 cmt. n.3(c); *United States* v. *Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007). Here, the gain consists of net profits from trading in ADT call options, which amounted to approximately $1.53 million.

4.      Pursuant to U.S.S.G. § 3B1.3, a 2-level enhancement is applicable for abuse of a position of special trust.

5.      Pursuant to § 3C1.1, a 2-level enhancement is applicable for obstruction of justice.

With a total offense level of 28 and a criminal history category of I, the Guidelines provide for a term of imprisonment of 78 to 97 months.

### A.  The Loss Amount Was Correctly Calculated

Afriyie objects to the calculation of the loss enhancement under U.S.S.G. § 2B1.1(b)(I) because it is based on "all 26 ADT transactions [and t]he jury's trial verdict is only demonstrably unanimous as to one ADT transaction." Def. Ltr. at 2; *see also* Def. Mem. at 5-6. Afriyie relies on *United States* v. *Sturdivant*, 244 F.3d 71 (2d Cir. 2001), but *Sturdivant* is relevant only where an indictment "combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a separate count for each offense." *United States* v. *Vilar*, 729 F.3d 62, 79 (2d Cir. 2013). By contrast, in this case, Afriyie's insider trading in the securities of ADT constituted a single continuing scheme, and "[a]s long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." *United States* v. *Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989) *cert. denied*, 493 U.S. 1081 (1990). The Second Circuit has long held that "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States* v. *Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) (*quoting Tutino*, 883 F.2d at 1141). Here, "the essence of [defendant's] alleged crime is carrying out a single scheme to defraud." *United States* v. *Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (approving inclusion of 50 fraudulent mailings in single mail fraud charge); *see United States* v. *Kurniawan*, 627 F. App'x 24, 27 (2d Cir. 2015) (alleged string of mailings in furtherance of his scheme to

10

defraud wine collectors by selling them counterfeit wine "could be characterized as part of a single continuing scheme") (*citing Olmeda,* 461 F.3d at 281). This is true even though it would be permissible to charge a separate count for every trade (for securities fraud) or wire (for wire fraud). *Tutino*, 883 F.2d at 1125.

Because the multiple trades constituting Afriyie's single, continuing insider trading scheme were properly aggregated, Afriyie is incorrect when he argues that "the only way that Mr. Afriyie's sentence can be enhanced based on trades beyond the one with the smallest amount of gain is through the doctrine of relevant conduct." Def. Mem. at 5-6. Rather, this Court is tasked with determining the loss amount of the *entire scheme*. Additionally, the Court is entitled to determine the loss amount by a preponderance of the evidence standard. S*ee United States* v. *Brennan*, 395 F.3d 59, 74 (2d Cir. 2005), *as amended on denial of reconsideration*, 406 F.3d 113 (2d Cir. 2005). Citing *dicta* from a Seventh Circuit case, Afriyie criticizes the applicability of the preponderance standard at sentencing for "satisf[ying] only the normal civil standard of proof." Def. Mem. at 6 (*quoting United States* v. *Horne*, 474 F.3d 1004, 1007 (7th Cir. 2007). But the applicability of this standard is, in fact, not at all controversial; the Second Circuit has long held that "[a] district court's factual findings relating to loss must be established by a preponderance of the evidence." *United States* v. *Sasso*, 59 F.3d 341, 353 (2d Cir. 1995). Indeed, the applicability of this standard derives from the doctrine that "facts in connection with sentencing need be established only by a preponderance of the evidence." *Id.* (*citing United States* v. *Concepcion*, 983 F.2d 369, 388 (2d Cir.1992), *cert. denied*, 510 U.S. 856 (1993)).), *cert. denied*, 510 U.S. 856 (1993).

Afriyie complains that following this well-established sentencing procedure would potentially enhance his sentence "on the basis of trades for which he may well not have been convicted, and possibly even acquitted." Def. Mem. at 6. But again, Afriyie ignores black-letter law holding that even *acquitted* conduct can be considered at sentencing:

> Since an "[a]cquittal d[id] not have the effect of conclusively establishing the untruth of all the evidence introduced against [a] defendant," *United States* v. *Sweig*, 454 F.2d 181, 184 (2d Cir. 1972), and since disputed facts for purposes of sentencing needed only to be established by a preponderance of the evidence, *see, e.g., United States* v. *Lee*, 818 F.2d 1052, 1057 (2d Cir.), *cert. denied*, 484 U.S. 956 (1987), the sentencing court was entitled to consider information that the defendant had engaged in conduct that was the subject of an acquittal, *United States* v. *Roland*, 748 F.2d 1321, 1327 (2d Cir.1984); *United States* v. *Sweig*, 454 F.2d at 183.

*United States* v. *Concepcion*, 983 F.2d at 388; *United States* v. *Crosby*, 397 F.3d 103, 115 (2d Cir. 2005) (Moreover, "a sentencing judge would . . . violate section 3553(a) by limiting consideration of the applicable Guidelines range to the facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range, as required by subsection 3553(a)(4), based on the facts found by the court.").

Here, of course, the jury did not acquit on either count and it returned a special verdict indicating that the full value of the proceeds derived from all of the trades in aggregate was forfeitable. The jury clearly believed all of the trades at issue were insider trading. But in any event, the law permits the Court to make such a finding by a preponderance of the evidence. The voluminous evidence presented at trial conclusively established that each and every one of Afriyie's trades in ADT was based on inside information and therefore support a judicial finding of a loss amount of $1.53 million.

12

### B.  An Enhancement for Obstruction of Justice Is Warranted

The enhancement for obstruction of justice is based on Afriyie's attempts to conceal or destroy evidence that was material to an official investigation after he learned that he was the target of an investigation. (PSR ¶ 50). More specifically, after his arrest – and after Afriyie falsely indicated to agents that Afriyie's mother had traded in ADT securities – Afriyie attempted to conceal and destroy evidence of the Email Account, which linked Afriyie to the Brokerage Account. (PSR ¶ 32). Afriyie had used the Email Account as the contact email address for the Brokerage Account, and had received at least three emails from TD Ameritrade regarding the Brokerage Account at the Email Account. Afriyie had also used the Email Account for other, legitimate purposes, and, as a result, there were two emails recovered from the Email Account addressed to "John Afriyie," showing that it was Afriyie, as opposed to his mother, who controlled and used the Email Account. In March 2016, before Afriyie's arrest, the Email Account was subscribed in the name "John Afriyie," with a contact email address of jafriyie@gmail.com. Two days after his arrest, on April 15, 2016, Afriyie falsely changed the name of the subscriber on the Email Account from "John Afriyie" to "Larry Afriyie," with a contact email address of lafriyie@gmail.com. Approximately two months later, on May 26, 2016, Afriyie deactivated the Email Account. (GX 807).

Afriyie objects to the application of the obstruction of justice enhancement on the grounds that the Email Account did not contain information "material to an official investigation," and that the Government conceded as much when it stated that the vast majority of the emails in the account at the time it was deactivated appear to be junk mail or spam. Def. Ltr. at 3; Def. Mem. at 9. This argument is unpersuasive.

13

As threshold matter, obstructive conduct that destroys or conceals evidence falls into two categories: contemporaneous to arrest, and non-contemporaneous to arrest. Only where such conduct "occurred contemporaneously with arrest" does the enhancement hinge on whether "it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender." *United States* v. *Rowlett*, 23 F.3d 300, 306 (10th Cir. 1994), quoting Application Note 4(d) to U.S.S.G. § 3C1.1, overruled on other grounds by *United States* v. *Goff*, 314 F.3d 1248, 1249–50 (10th Cir. 2003). In this case, Afriyie's obstructive conduct started two days after his arrest; in other words, non-contemporaneously with his arrest. Obstruction of this type need not be a material hindrance to an investigation. *United States* v. *Morris*, 573 F. App'x 712, 728 (10th Cir. 2014) (upholding an obstruction-of-justice enhancement based on defendant's instruction to his client to delete all emails from the defendant, despite the fact that law enforcement recovered almost all of the client's emails anyway). "[T]he degree of hindrance is irrelevant; all that matters . . . is that [the defendant] attempted to obstruct the investigation." *Id.*

Even if it had been contemporaneous conduct, however, the defendant's efforts to obstruct justice were a "material hindrance." The fact that the account contained mainly junk mail or spam does not—by any stretch of the imagination—mean that the account was not important to the Government's investigation. On the contrary, the contents of and the subscriber information associated with the Email Account were highly material to the Government's investigation in proving Afriyie's control of the Brokerage Account through which the illegal insider trading took place.

14

- *First,* as of March 18, 2016, prior to Afriyie's arrest, the Email Account was subscribed in the name "Mr. John Afriyie" with a recovery email address of jafriyie@gmail.com. (GX 600, 807). Because the Email Account was the only email account associated with the Brokerage Account, information so clearly linking the Email Account to Afriyie was valuable in proving Afriyie's control of the Brokerage Account.

- *Second*, TD Ameritrade communicated with Afriyie about the Brokerage Account through the Email Account on at least three occasions. In November 2007, TD Ameritrade sent an automated email entitled "Start trading today!" to the Email Account. In September 2013, TD Ameritrade sent an email entitled "The forms you recently requested," which attached a form entitled "Inbound Wire Instructions for Your Financial Institution," to the Email Account. And on March 9, 2016, the TD Ameritrade sent an email to the Email Account entitled "Portfolio Margin Application," which read, "Hello Lawrencia, Per your request, please find the required document for Portfolio Margining attached to this email." The three attachments to the email were entitled "Portfolio Margin Risk Disclosure Statement Acknowledgement," "Portfolio Margin Test," and "Portfolio Margin Upgrade Request."

- *Third*, the Email Account also contained emails, unrelated to TD Ameritrade or the Brokerage Account, that showed that it was Afriyie – and not his mother or some other third party – who used the Email Account. For example, the Email Account received automated emails addressed to "John Afriyie" from Twitter (GX 605, 807) and from "Pharmainsight.com." (GX 604, 807).

15

For these three reasons, the Email Account and its contents were undoubtedly "material" to the Government's investigation.

In order for the obstruction-of-justice enhancement to apply, the defendant must have acted "willfully," which has been interpreted to mean the defendant must have "consciously act[ed] with the purpose of obstructing justice." *United States* v. *Revel*, 971 F.2d 656, 661 (11th Cir. 1992). Here, Afriyie's purpose in changing the subscriber information and deleting the Email Account is readily apparent: to make it appear that the Email Account, and by extension the Brokerage Account in which the illegal trading took place, belonged to his mother rather than to him. Circumstantial evidence can prove that defendant acted with intent to impair the investigation. *See United States* v. *Gadsden*, 616 F. App'x 539, 544 (4th Cir. 2015) (upholding obstruction-of-justice enhancement based on evidence that the defendant deleted email accounts within days of his conversation with an FBI agent about a bank fraud investigation and that IP address used to log in to deleted email accounts matched the IP address used to log into the defendant's known email account). Here, Afriyie changed the subscriber information on the Email Account just two days after his arrest, and the new version of the subscriber information was consistent with the accountholder information on the Brokerage Account and consistent with the false story he had provided to agents. After his indictment, Afriyie deactivated the Email Account altogether, in the hopes of erasing the fact of its prior existence.

Unsurprisingly, deleting emails is sufficient for an obstruction enhancement. *See, e.g., Gadsden*, 616 F. App'x at 544; *United States* v. *Simpson*, 741 F.3d 539, 551–52 (5th Cir. 2014), *cert. denied*, 134 S. Ct. 2318 (2014), and *cert. denied sub nom. Shafer* v. *United States*, 134 S. Ct. 2320 (2014) (rejecting defendant's argument that deleting email in response to being told

about the execution of search warrants at a co-conspirator's home and office is insufficient to support a conviction for obstruction of justice conviction under 18 U.S.C. § 1512(c)(1)); *United States* v. *Malki*, 609 F.2d 503, 511 (2d Cir. 2010) (obstruction enhancement proper based on— along with positive misrepresentations to the Court— defendant's deleting cell phone records just before he was interviewed by Government agents and deleting emails after such interviews). Since the act of deleting individual emails has supported the obstruction enhancement, deleting an entire email account would *a fortiori* support such an enhancement.

### C. An Enhancement for Abuse of a Position of Special Trust is Warranted

Section 3B1.3 of the Guidelines provides for a two-level enhancement of Afriyie's offense level "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." Under Application Note 1 to this section, a position of trust is "characterized by professional or managerial discretion," and is held by "persons [who] . . . ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." The Application Note adds that, for this enhancement to apply, "[t]he position of public or private trust must have contributed in some significant way to facilitate the commission or concealment of the offense."

In insider trading cases, a higher standard must be met in order for the enhancement to apply. According to the Commentary to Section 2B1.4, the guideline applicable to the insider trading offense, the Section 3B1.3 enhancement applies only when "the defendant occupied and abused a position of special trust." Comment. n. 2. The Guidelines and commentary do not define "a position of special trust." But Application Note 2 does provide examples of "a position of special trust," such as "a corporate president" and "a lawyer who regularly provides

professional assistance in securities transactions." The Application Note explains that the enhancement "should be applied if the defendant's employment in a position that involved regular participation or professional assistance in creating, issuing, buying, selling, or trading securities or commodities was used to facilitate significantly the commission or concealment of the offense." For example, the enhancement would apply "to a hedge fund professional" who routinely participates in securities transactions or to "a lawyer who regularly provides professional assistance in securities transactions." The Sentencing Commission, in the November 2012 amendments to the Guidelines, explained why the enhancement would apply in these contexts. In such cases, it states, the defendant "possess[es] special knowledge regarding financial markets and the rules prohibiting insider trading, and generally [is] viewed as more culpable." *See* § 3B1.3, comment. (backg'd).

In *United States* v. *Braverman,* this Court considered the applicability of the enhancement to an insider trading case where the defendant was employed at a law firm as a senior information systems engineer, was responsible for maintaining the law firm's software, and had access to the law firm's proprietary databases containing privileged client information. *See United States* v. *Braverman*, No. 14 Cr. 748 (PAE) (S.D.N.Y. Aug. 19, 2015) (Docket No. 129) (Sentencing Tr. at 10). The Court found three factors to be of particular relevance: first, whether the defendant was a high-ranking employee more akin to, for example, a hedge fund professional than a clerical worker; second, what the nature of the relationship was between the defendant and the entity whose confidential information was misappropriated; and, third, what the nexus was, if any, between the defendant's job, on the one hand, and securities trading and the securities market, on the other. *Id.* at 14. Applying these three factors to the facts of the

18

*Braverman* case, this Court found that the defendant was closer to a "clerical worker" than to a "corporate president, a hedge fund professional, or a lawyer who regularly provides professional assistance in securities transactions"; the defendant's job put him "at least one and maybe more degrees of separation from the firm clients whose confidential information . . . he misappropriated"; and the defendant had no "special knowledge regarding the financial markets and the rules prohibiting insider trading." *Id.* at 14-15. In declining to apply the enhancement, the Court also noted that the defendant was "removed from" the firm's business in advising clients, in fact had no nexus to any firm client, and "merely had access to and some degree of operational control over the firm's databases, in which resided the confidential information." *Id.* at 17.

The facts of the present case are readily distinguishable from those of *Braverman*. Afriyie initially objected to the abuse of trust enhancement on the grounds that the PSR incorrectly referred to Afriyie as a "hedge fund professional," while in fact Afriyie was employed at MSD Capital, a "family office . . . that managed the assets of Michael Dell and his family." Def. Ltr. 3. Afriyie maintained that "this classification is separate and distinct from a hedge fund which has a different classification under the Securities and Exchange Commission" and that his position was an "entry level junior analyst" which required no specific skill. (*Id.*) In response to Afriyie's objection, the final PSR refers to Afriyie as an "investment professional." However, Afriyie continues to maintain that he held merely an "entry level" position at MSD. Def. Mem. at 7.

In fact, Afriyie's role at MSD was functionally equivalent to a "hedge fund professional" and it was in no way "entry level." At MSD, he earned a base salary of $150,000 and a bonus of $120,000. (PSR ¶ 73). At MSD, only investment professionals like Afriyie had access to the R

drive, where MNPI about upcoming transactions was saved. (Tr. 409, 427, 439). Immediately before joining MSD, Afriyie had worked for two years as an investment analyst at a hedge fund called Force Capital Management, with similar compensation. (PSR ¶ 74). The way Afriyie described the work he did at that hedge fund – "perform deep-dive, bottom up fundamental analysis on attractively valued companies, and prepare investment memorandums to present to portfolio manager" and "develop and maintain robust operating and valuation models" – also described the work he performed at MSD. (GX 381). The difference between working at a hedge fund and at a family office is one of form rather than function. The fact that hedge funds can invest third-party money makes them subject to stricter regulation by the SEC, but the type of analysis performed, and the skill set required are nearly identical. And critically, the duties of professionals are the same at either institution: to safeguard the fund's sensitive financial information and use it only in furtherance of that fund's interests. Since Afriyie was the equivalent of "a hedge fund professional" who routinely participated in securities transactions, the first factor set forth in *Braverman* weighs in favor of applying the abuse-of-trust enhancement in Afriyie's case.

With respect to the second factor identified by this Court, Afriyie had a direct relationship with MSD, and MSD was the source of the MNPI that Afriyie misappropriated and used to trade illegally. As explained above, Afriyie entered into a relationship with MSD wherein he explicitly pledged a duty of confidentiality and loyalty, and agreed not to trade on any information he obtained through his employment with MSD. *See infra* at Section I.A. By acting in contravention of this agreement, Afriyie was abusing a position of special trust that he held at MSD.

As for the third factor, Afriyie did, in fact, possess special knowledge regarding financial markets and the rules prohibiting insider trading that make his violations of the law deserving of increased punishment. For example, Afriyie was able to calculate the anticipated premium over the current stock price that Apollo would have to pay to acquire ADT. An administrative or IT specialist employed at MSD would have neither the access to the R drive to collect such MNPI nor the skills to make sophisticated price predictions in the way that Afriyie did. (Tr. 409, 427, 439). Thus, the three primary factors identified by this Court as justifying the imposition of the abuse-of-trust enhancement in insider trading cases tip strongly in favor of applying the enhancement in Afriyie's case.

## V.    The Section 3553(a) Analysis

In view of the significant need in this case to reflect the seriousness of the offense, afford just punishment, and promote deterrence and respect for the law, a sentence within the applicable Guidelines range of 78 to 97 months' imprisonment would be sufficient but not greater than necessary to serve the goals of sentencing.

### A.   The Nature and Circumstances of the Offense and the Need to Provide Just Punishment

First, the nature and circumstances of the offense and the need to provide just punishment weigh decidedly in favor of a sentence within the Guidelines range.

The seriousness of Afriyie's offense is manifest. A fundamental purpose of the securities laws is to ensure fair dealing and to outlaw deceptive and inequitable practices in the securities markets. The integrity of the capital markets is critical to the functioning of the nation's economy, which depends upon well-functioning markets for liquidity and access to capital.

21

Congress recognized that any deceptive or manipulative practice that influenced or related to trading activity undermined the function and purpose of a free market. Insider trading causes that harm – namely, by undermining the public's confidence in the capital markets, and by suggesting to ordinary investors that they should not invest because those markets are rigged in favor of market insiders like Afriyie. Not only did Afriyie's crimes harm the integrity of the markets, they harmed his employer and the clients of his employer, whose business secrets Afriyie stole for his own benefit.

Afriyie's misconduct was brazen and egregious. He committed two separate schemes to misappropriate inside information from MSD clients and use that information to enrich himself through options trading. Afriyie then repeatedly lied to his employer, his broker, and the FBI and destroyed evidence in order to cover up his criminal conduct. Moreover, many of these aggravating features of Afriyie's conduct are not even reflected in the Guidelines analysis. The Guidelines calculation would be the same if Afriyie had committed insider trading in ADT only, and had never committed insider trading in XPO or lied to anyone or the Court about his conduct. The egregiousness of his conduct and lies weigh decidedly in favor of a Guidelines sentence.

### B.    Afriyie's History and Characteristics

Unlike many defendants who appear before the Court, Afriyie apparently did not commit his crimes out of any pressing financial need. Rather, Afriyie was well educated and trained, having graduated from Cornell and completed a prestigious analyst program at Lazard. During his last year at MSD, he earned a salary and bonus of more than $272,000. He had the support of family and friends, as he emphasizes in his sentencing submission. But that was not enough for

Afriyie. Motivated by pure greed and a sense of entitlement, Afriyie brazenly traded on inside information to generate more than $1.5 million in criminal profits. Afriyie quickly spent the money he received on himself – on trips around the country, on bottle service at night clubs, and other personal expenses.

The conduct at issue, moreover, was not a brief aberration for Afriyie. Afriyie's scheme was calculated and pervasive. After Afriyie traded on inside information in XPO securities, he learned from his mistakes and used his criminal knowledge to generate huge profits when another insider trading opportunity – in ADT securities – came along. And when Afriyie was confronted with his criminal conduct, he chose to lie – to the FBI, his employer, and to the Court – and worked to destroy evidence. Against the backdrop of Afriyie's education and lucrative employment, Afriyie's flagrant disregard of the duties he owed his employer and its clients and of the law weighs strongly in favor of a Guidelines sentence.

Afriyie's history and characteristics are also reflected in his disrespect for the Court. Afriyie deliberately refused to appear on the first day of his own trial and then willfully lied to the Court about his failure to appear. That Afriyie knowingly tried to skip his own trial and then lied to the Court about his intentions plainly reflects Afriyie's sense of entitlement, lack of respect for the criminal justice system, and view that he is above the law. All of these facts weigh in favor of a Guidelines sentence.

### C.    The Need for Deterrence and to Promote Respect for the Law

It is plain from Afriyie's offense conduct – two separate insider trading schemes, repeated lies to his employer, his broker, and the FBI, and his destruction of evidence – that a Guidelines sentence is necessary in Afriyie's case to afford specific deterrence and promote

23

respect for the law.

But general deterrence is also particularly important. Because insider trading schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). Should Afriyie receive a light sentence, financial professionals may be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that even if they are caught, they will not face significant jail time. In addition, such a sentence would further erode the public's confidence in the integrity of the public markets by sending the message that even when financial professionals are caught engaging in white collar crimes, they are only lightly punished. To deter criminal conduct by professionals like Afriyie, effectuate the purpose of the securities fraud laws, and send an appropriate message that this type of fraud will not be tolerated, a sentence within the Sentencing Guidelines range is warranted.

Afriyie's arguments to the contrary lack merit. First, a below-Guidelines sentence would not serve the goals of either specific or general deterrence. In view of his total lack of remorse and flouting of the criminal justice system, a Guidelines sentence is necessary to deter Afriyie and other investment professionals and appropriately convey the severity of insider trading. Similarly, the goal of promoting respect for the law would be undercut rather than furthered by a below-Guidelines sentence here.

Second, while Afriyie summarily claims that he was a "financial bulwark" for his family

(Def. Mem. 18), there is just a single, straightforward reason why Afriyie committed this crime: greed. Afriyie did not spend his $1.5 million in criminal profits on good works or on necessities for his family, but on personal possessions and entertainment for himself. Although Afriyie contends that a substantial term of imprisonment would cause hardship to his family, Afriyie overlooks the fact that he has not provided financial support for anyone other than himself.

Finally, Afriyie's purported claim of acceptance of responsibility rings hollow. In his letter to the Court, Afriyie dismisses his conduct as "a bad move" resulting from "misguided instincts" and "impulsive behavior." (Def. Ex. 20). Yet he ignores that his conduct was egregious, pervasive, and calculated. Afriyie expresses remorse, and the Government does not doubt the sincerity of that expression. But his letter makes plain that Afriyie is remorseful primarily for getting caught – and the resulting personal "humiliation, embarrassment, and defeat." (*Id*.) But nowhere does Afriyie express remorse toward his employer, MSD Capital, or its clients for violating his duties of trust and misappropriating confidential information. Nor does he express any remorse for deceiving his employer for years, or for lying to the FBI or his broker. At bottom, Afriyie's letter is a contrived effort to obtain leniency from the Court rather than a sincere expression of contrition for egregious misconduct.

For all these reasons, the Government respectfully submits that a Guidelines sentence is appropriate.

### VI.    The Government's Proposed Restitution Order

Afriyie objects to MSD Capital's request for restitution on the grounds that "[i]n the context of legal fees, there are few 'necessary' expenses beyond the cost of an internal investigation," and "[a]s far as Sullivan and Cromwell's invoices show . . . there were no internal

investigations and no Government subpoenas directed to MSD Capital." Def. Mem. at 10-11. Afriyie is incorrect. The Mandatory Victim Restitution Act itself entitles victims to restitution for "necessary . . . other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). As Judge Rakoff noted in *United States* v. *Gupta*, 925 F. Supp. 2d 581, 584 (S.D.N.Y. 2013), the Second Circuit has taken a "very broad view" of necessary expenses. These can include legal fees of outside counsel when the criminal conduct "force[d]the corporation to expend large sums of money on its own internal investigation *as well as its participation in the government's investigation and prosecution of defendants' offenses*." *United States* v. *Amato*, 540, F.3d 153, 162 (2d Cir. 2008) (emphasis added). In this case, the Government has reviewed the invoices of MSD's outside counsel, and finds that, under clearly-established Second Circuit law, MSD is entitled to restitution for these expenses. Attached for the Court's reference are two invoices, dated April 13, 2017 and May 23, 2017, as well as a letter from Sullivan & Cromwell on behalf of MSD, that were submitted to the Government and the U.S. Probation Office in support of MSD's request for restitution.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines range of 78 to 97 months' imprisonment would constitute a reasonable and just sentence in this case, and respectfully requests that the Court also enter the proposed Restitution Order.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: _____/s/_____
Edward A. Imperatore
Christine I. Magdo
Assistant U.S. Attorneys

Encl.

cc:     Mitchell Dinnerstein, Esq. (by ECF and email)

27